IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHRISTOPHER SCOTT, #R31806, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 17-cv-01127-JPG |
| DR. SIDDIQUI, DR. RITZ, and WEXFORD HEALTH SERVICES, INC., | ) |
| Defendants. | ) |

# MEMORANDUM & ORDER

**GILBERT, District Judge:**

This matter comes before the Court for consideration of a Motion for Summary Judgment filed by Defendants Siddiqui, Ritz, and Wexford Health Services, Inc. ("Wexford"). (Doc. 61). For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED**.

## PROCEDURAL HISTORY

Plaintiff Christopher Scott (Inmate No. R31806), is currently incarcerated at Western Illinois Correctional Center. He filed this lawsuit pursuant to 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment rights that resulted from inadequate medical care for a right knee injury at Menard Correctional Center. Following threshold review of the Complaint under 28 U.S.C. § 1915A, Plaintiff was allowed to proceed with two Eighth Amendment deliberate indifference claims, including Count 1 against Doctors Siddiqui and Ritz for their alleged refusal to properly treat Plaintiff's right knee and Count 2 against Wexford for instituting an unconstitutional policy, custom, or practice of offering low-cost care in lieu of MRIs. (Doc. 5).

Following discovery, Defendants filed their Motion for Summary Judgment on the merits of Plaintiff's claims on May 16, 2019, relying primarily on Dr. Ritz's declaration (Doc. 62-2) and

1

Plaintiff's medical records (Doc. 62-3) and deposition testimony (Doc. 62-1). (*See* Doc. 61). Plaintiff filed a response in opposition to the motion on July 22, 2019. (Doc. 66). He admitted that the facts of this case are largely undisputed but argues that the facts and law still preclude summary judgment. (*Id.*). Defendants filed a reply on August 1, 2018. (Doc. 68).

## FINDINGS OF FACT

### A. The Parties

Plaintiff Christopher Scott is an inmate in the custody of the Illinois Department of Corrections ("IDOC") and was housed at Menard at all relevant times. (Doc. 62-1, p. 2).

Defendant Mohammed Siddiqui is a medical doctor who was employed by Wexford to provide medical care to inmates at Menard at all times relevant to the Complaint. (Doc. 62, ¶ 3). Dr. Siddiqui's involvement in Plaintiff's medical care included clinical evaluations, treatment for pain, and referrals for x-rays and a right-knee MRI. (Doc. 62-2, ¶¶ 12, 24-25, 28-30).

Defendant Stephen Ritz is a licensed physician who served as Wexford's Corporate Utilization Management Medical Director at all relevant times. (*Id.* at ¶¶ 3-4). Dr. Ritz participated in the collegial review process for inmate medical care. (*Id.*). In this capacity, he reviewed requests for a right-knee MRI submitted on behalf of Plaintiff. (*Id.* at ¶ 5).

Defendant Wexford Health Sources, Inc. is a private medical corporation responsible for providing medical services to IDOC inmates, including inmates at Menard. (*Id.* at ¶ 6). Wexford uses a Utilization Management ("UM") Program and Collegial Review Process to ensure the availability and delivery of medically-necessary and clinically-appropriate levels of care, and claims to do so irrespective of cost. (*Id.* at ¶¶ 6-8). Referral requests for off-site medical care, like those at issue in this case, are reviewed by Wexford's UM Department. (*Id.* at ¶ 9). Before making a decision about a referral request, a UM physician consults with a site physician about the

inmate's medical history, current medical condition, treatment for the condition, patient compliance with the treatment plan, and alternative treatment options, among other things. (*Id*.).

**B.     Plaintiff's Medical Care**

Plaintiff suffered a right knee injury while exercising outside at Menard on July 16, 2016. (Doc. 62-1, pp. 2-3). He experienced sharp pain around his right kneecap. (*Id*.). Plaintiff told several officers that he needed to see a nurse about the injury. (*Id*.).

On July 21, 2016, Plaintiff was seen by a nurse in the prison's health care unit ("HCU"). (*Id*. at p. 3; Doc. 62-2, ¶ 11; Doc. 62-3, p. 1). He had difficulty straightening his right leg. (Doc. 62-2, ¶ 11; Doc. 62-3, p. 1). Although he complained of pain, he refused "protocol" pain medications. (Doc. 62-1, pp. 3, 6-7, 13-14; Doc. 62-2, ¶ 11; Doc. 62-3, p. 1). At the time, he was already taking Tylenol on a daily basis for another condition but admits that he may not have mentioned this when refusing pain relievers. (Doc. 62-1, pp. 3, 6-7, 13-14). He was referred to a medical doctor for further evaluation. (Doc. 62-2, ¶ 11; Doc. 62-3, p. 1).

On July 25, 2016, Dr. Siddiqui met with Plaintiff to discuss his knee injury. (Doc. 62-1, p. 3; Doc. 62-2, ¶ 12). Dr. Siddiqui noted good range of motion and no swelling but ordered an x-ray of his knee. (*Id*.; Doc. 62-3, p. 2). Right knee x-rays taken in late July 2016 showed "[n]o suprapatellar joint effusion," "[n]o acute displaced fracture," and "[n]o dislocation." (Doc. 62-1, p. 3; Doc. 62-3, p. 3). However, Plaintiff continued to experience right knee buckling, grinding, instability, pain, and swelling. (Doc. 62-1, pp. 3-4).

On October 26, 2016, he returned to the HCU complaining of intermittent right knee pain. (Doc. 62-1, p. 3; Doc. 62-2, ¶ 13; Doc. 62-3, p. 4). A nurse noted no signs of obvious discomfort but rather a limited range of motion due to pain and weakness. (Doc. 62-2, ¶ 13; Doc. 62-2, p. 4). The nurse referred Plaintiff for further evaluation with a doctor. (Doc. 62-1, p. 4, Doc. 62-2, ¶ 13).

3

On October 28, 2016, Plaintiff instead met with Nurse Practitioner ("NP") Tindall, who performed Drawer and Lachman tests that were both negative. (Doc. 62-2, ¶ 14; Doc. 62-3, p. 5). She noted slight swelling and redness in Plaintiff's knee. (*Id*.). She prescribed ibuprofen, but Plaintiff refused the pain medication because he was already taking pain relievers 2-3 times daily for another condition. (Doc. 62-1, pp. 6-7, 13; Doc. 62-2, ¶ 14; Doc. 62-3, p. 5). NP Tindall also made a referral for an MRI, but Plaintiff claims she told him that "they" probably would not approve it because of "an unwritten policy." (Doc. 62-1, pp. 4, 10; Doc. 62-2, ¶ 14; Doc. 62-3, pp. 5-6).

Plaintiff's case was presented for collegial review by Dr. Trost. (Doc. 62-2, ¶ 15; Doc. 62-3, p. 10). Dr. Ritz and Dr. Trost discussed the matter and ultimately agreed that Plaintiff would benefit from physical therapy with an outside provider before reconsidering a request for an MRI referral. (Doc. 62-1, p. 5; Doc. 62-2, ¶ 15; Doc. 62-3, pp. 7-10). The MRI referral was denied at that time, with a recommendation to re-present the request if necessary. (*Id*.).

On November 17, 2016, Plaintiff was referred for a physical therapy evaluation. (Doc. 62-2, ¶ 18; Doc. 62-3, pp. 11-12). He was seen at Southern Illinois Healthcare Rehabilitation Institute of Chicago on November 29, 2016. (*Id*.). There, Plaintiff complained of increased pain while jogging and squatting 150 pounds. (Doc. 62-2, ¶ 18; Doc. 62-3, pp. 12-14). His knee was not swollen at the appointment. (*Id*.). His flexion and extension were within normal limits. (*Id*.). The gross strength of his knee showed only a minor deficit (4/5 instead of 5/5), and his knee girth measurements were normal. (*Id*.). He reported pain of 3/10 and pain when contracting his quadriceps. (*Id*.). Test of his hips revealed some minimal loss of gross strength on the right side. (Doc. 62-2, ¶ 19; Doc. 62-3, pp. 12-14). Palpation of his right patellar tendon was positive for patellar tendonitis and some crepitus with flexion and extension. (*Id*.)

The physical therapist suspected patellofemoral syndrome (*i.e.* "runner's knee") that was aggravated by tight IT bands and a weak quadriceps muscle. (Doc. 62-2, ¶ 20; Doc. 62-3, p. 13). He recommended a 1-2 month course of home exercises, consisting of squats and leg raises, to be completed in Menard's HCU. (Doc. 62-1, p. 5; Doc. 62-2, ¶ 20; Doc. 62-3, pp. 12-15). Plaintiff performed these exercises regularly for six weeks. (Doc. 62-1, p. 5; Doc. 62-2, ¶ 21).

At follow-up appointments in Menard's HCU on December 5 and 7, 2016, Plaintiff reported completion of the exercises as tolerated. (Doc. 62-1, p. 7; Doc. 62-2, ¶ 21; Doc. 62-3, p. 16). At his deposition, Plaintiff testified that at least one of the squatting exercises caused his knee to swell. (Doc. 62-1, p. 7). However, he showed no signs of swelling at either appointment and had "steady" ambulation. (Doc. 62-2, ¶ 21).

At another follow-up appointment with a nurse practitioner on December 22, 2016, Plaintiff reported pain when extending his leg, but he showed no signs of swelling or redness. (Doc. 62-2, ¶ 22; Doc. 62-3, p. 17). At the same appointment, he refused pain medication. (*Id.*).

On January 4, 2017, he again met with NP Tindall. (Doc. 62-2, ¶ 23; Doc. 62-3, p. 18). He reported feeling OK and wanted to wait to see how physical therapy went. (*Id.*).

On January 30, 2017, Plaintiff again met with a physical therapist. (Doc. 62-2, ¶ 23; Doc. 62-3, p. 19). He complained of pain but only reported a minor increase with exercises that included ten mini-squats. (*Id.*). He continued treatment with the physical therapist on February 2 and 3, 2017. (Doc. 62-2, ¶ 23; Doc. 62-3, p. 20). At each of these appointments, the only issues noted were tightness of IT bands, fatigue with hip exercises, and weak hip flexors. (*Id.*).

On April 4, 2017, Plaintiff met with Dr. Siddiqui again. (Doc. 62-1, p. 11; Doc. 62-2, ¶ 24; Doc. 62-3, p. 22). He showed a "slight" loss of range of motion with flexion/extension. (Doc. 62-2, ¶ 24; Doc. 62-3, p. 22). When Plaintiff continued to complain of right knee pain, Dr. Siddiqui

5

referred him for an MRI. (Doc. 62-1, p. 11; Doc. 62-2, ¶ 24; Doc. 62-3, p. 22). However, Dr. Siddiqui also noted no complaints of pain during the preceding two days and no signs of redness or swelling. (*Id.*).

On April 11, 2017, Dr. Siddiqui's referral was presented for collegial review by Dr. Matticks. (Doc. 62-2, ¶ 25; Doc. 62-3, pp. 23-25). After discussing the matter, Drs. Matticks and Ritz created an alternative treatment plan that included verification that Plaintiff was able to complete all activities of daily life (ADLs), a course of long-acting NSAID medication, follow-up x-rays, and another collegial review, if necessary. (Doc. 62-2, ¶ 26; Doc. 62-3, pp. 23-25).

Dr. Siddiqui evaluated Plaintiff in a follow-up appointment on April 27, 2017. (Doc. 62-2, ¶ 28; Doc. 62-3, p. 26). Plaintiff reported an increase in his symptoms with physical therapy. (*Id.*). However, Dr. Siddiqui examined Plaintiff's knee and noted no swelling and a normal range of motion. (*Id.*).

On May 16, 2017, Dr. Siddiqui relayed information from Plaintiff's most recent visit at a third collegial review. (Doc. 62-2, ¶ 29; Doc. 62-3, p. 27). He reported Plaintiff's continued complaints of knee pain with no swelling, normal range of motion, and negative x-rays. (*Id.*). Dr. Siddiqui also reported prescribing Tylenol (325 mg). (*Id.*). Based on these findings, Plaintiff's third MRI request was denied. (Doc. 62-2, ¶¶ 30-31; Doc. 62-3, pp. 28-29). His symptoms were deemed consistent with mild inflammation of the right knee (*i.e.*, runner's knee) and musculoskeletal weakness. (*Id.*). However, Dr. Siddiqui was invited to re-present Plaintiff's case, if future evaluation revealed symptoms of pathologic injury necessitating an MRI. (Doc. 62-2, ¶ 32; Doc. 62-3, p. 30).

The following month, Plaintiff declined pain medication. (Doc 62-3, p. 30). On October 25, 2017, x-rays taken of Plaintiff's right knee revealed mild osteoarthritis of the knee joint with little change from the prior study. (Doc. 62-3, p. 31).

As time passed, Plaintiff abandoned the exercises recommended by his physical therapist and performed exercises he devised for himself. (Doc. 62, ¶¶ 29, 34; Doc. 62-1, p. 12). Plaintiff did not seek any medical treatment for his knee in 2019. (Doc. 62, p. 5, ¶ 33; Doc. 62-1, p. 12). However, he complains of ongoing knee pain. (Doc. 62-1, p. 12).

Plaintiff claims that Drs. Siddiqui and Ritz were deliberately indifferent to his knee injury in violation of the Eighth Amendment when they refused to refer him for an MRI. (Docs. 1 and 5; Doc. 62, p. 2, ¶ 5). He further alleges that Wexford has an unconstitutional policy, custom, or practice of recommending low-cost treatment options in place of MRIs. (Docs. 1 and 5; Doc. 62, p. 2, ¶ 6). Plaintiff specifically pointed to a single "orthopedic policy and procedure" that Plaintiff believes prevents him from getting the treatment he wants, but testified that he does not believe the policy, itself, is unconstitutional. (Doc. 62, ¶¶ 30-32; Doc. 62-1, pp. 9, 11). He instead faults the course of treatment provided. (Doc. 62, p. 6, ¶ 31; Doc. 62-1, p. 11).

## LEGAL STANDARDS

Summary judgment is appropriate only if the moving party can show "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celetex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the burden of establishing that no material facts are genuinely disputed. *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). Any doubt about the existence of a genuine issue must be resolved in favor of the nonmoving party. *Id*.

When presented with a motion for summary judgment, the Court does not decide the truth of the matters presented, and it cannot "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC,* 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir 1994). The Court must instead "view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party[,]" then a genuine dispute of material fact exists. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

## DISCUSSION

Plaintiff's claims are governed by the Eighth Amendment, which prohibits cruel and unusual punishment of convicted persons. *See* U.S. CONST., amend. VIII. The Eighth Amendment safeguards inmates against pain and suffering that serves no penological purpose. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). It obligates prison officials to provide inmates with adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

The Court applies a two-part analysis to Eighth Amendment claims of inadequate medical care. *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005). First, the Court must determine whether the plaintiff suffered from a sufficiently serious medical condition, from an objective standpoint. *Id*. Second, the Court must determine whether each defendant responded with deliberate indifference, from a subjective standpoint. *Id*. This analysis requires the Court to evaluate the "totality of an inmate's medical care." *Petties v. Carter*, 836 F.3d 722, 728-29 (7th Cir. 2016).

8

The parties do not dispute that Plaintiff's medical condition satisfies the first prong of this analysis for summary judgment purposes.

The question for the Court, then, is whether the defendants responded with deliberate indifference to the medical condition. A defendant is deliberately indifferent when he knows of a serious risk to the prisoner's health but consciously disregards the risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). Negligence, gross negligence, or even recklessness does not support an Eighth Amendment claim. *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). The deliberate indifference standard "approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073.

With that said, a prisoner is not required to show that he was literally ignored by his health care providers, and the undisputed facts support no such finding. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). Dr. Siddiqui repeatedly evaluated Plaintiff's right knee injury in 2016 and 2017. Each time, he examined Plaintiff and considered his subjective complaints of pain, swelling, redness, and limited range of motion. On several occasions, Dr. Siddiqui ordered follow-up x-rays and pain medication for intermittent pain. Dr. Siddiqui referred Plaintiff for an MRI in April 2017, when he reported continued pain and a slight loss in his range of motion—despite no signs of swelling or redness. Dr. Siddiqui followed up with Plaintiff the same month to make changes to his treatment plan, discussed below, following the completion of a second collegial review. He revisited Plaintiff's treatment plan in May 2017 at a third collegial review, when Plaintiff complained of pain with physical therapy—despite showing no signs of swelling and a normal range of motion.

Dr. Ritz considered three separate MRI referral requests submitted on Plaintiff's behalf in October/November 2016, April 2017, and May 2017. Each time, Dr. Ritz consulted with a site

9

physician and determined the appropriate course of treatment. In October/November 2016, Dr. Ritz and Dr. Trost considered NP Tindall's referral request and decided that Plaintiff would benefit from a course of physical therapy before an MRI would be considered. In April 2017, Dr. Ritz conferred with Dr. Matticks about Dr. Siddiqui's referral request and created an alternative treatment plan that included verification that Plaintiff could complete all activities of daily life, a course of long-acting NSAID medication, and follow-up x-rays before another collegial review was scheduled. Dr. Siddiqui then met with Plaintiff to implement this plan. In May, Dr. Ritz reviewed Plaintiff's care with Dr. Siddiqui, and they concluded that no change to the treatment plan would be made at that time. However, Dr. Siddiqui was invited to revisit the issue, if and when objective medical findings suggested a pathologic injury requiring further investigation with an MRI. However, x-rays in October 2017 revealed no significant changes to Plaintiff's knee, beyond mild osteoarthritis. Plaintiff subsequently stopped pursuing treatment for his knee.

At most, this evidence suggests a disagreement in the proper course of treatment between medical professionals. However, standing alone, a disagreement between two medical providers about treatment is generally insufficient to support a deliberate indifference claim. *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). The Seventh Circuit has characterized such cases "not [as] deliberate indifference to a serious medical need, but as a challenge to a deliberate decision by a doctor to treat a medical need in a particular manner." *Lockett*, 937 F.3d at 1023 (quoting *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (internal quotation marks omitted)). In such cases, the court should defer to a medical professional's treatment decision "unless no minimally competent professional would have so responded under those circumstances." *Id.*; *Pyles*, 771 F.3d at 409.

Whether an x-ray, additional diagnostic testing, or another form of treatment altogether is indicated is a "classic example" of a "matter for medical judgment." *West v. Matz*, 740 F. Appx. 103, 104 (7th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. at 107). And "[alt]hough poor medical judgment does not amount to medical deliberate indifference, it can rise to the level of negligence." *Id*. However, this case does not involve a medical negligence claim, and the proper forum for a negligence or medical malpractice action is the state court. *Id*.

To the extent Plaintiff claims that the defendants persisted in an ineffective or less-costly course of treatment, no reasonable jury would agree. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (persistence in ineffective course of treatment can create a jury question regarding deliberate indifference that precludes summary judgment). Plaintiff's treatment plan was repeatedly reviewed and revised by Drs. Siddiqui and Ritz. Revisions included one or more referrals to an outside physical therapist in October/November 2016 and January/February 2017, numerous images of his knee between July 2016 and October 2017, and additional orders for long-lasting pain medication in April 2017, among other things. Plaintiff's refusal to comply with or participate in new or different forms of treatment does not render his treatment plan ineffective—at least not because of defendants.

Further, Plaintiff's ongoing knee pain does not preclude summary judgment. There is no constitutional requirement that a prison doctor keep an inmate "pain-free." *See Franklin v. Bowens*, 777 F. App'x 168, 169 (7th Cir. 2019) (quoting *Snipes*, 95 F.3d at 592). Though a dispute exists regarding Plaintiff's compliance with pain management recommendations made by the defendants, it is undisputed that Plaintiff did not inform the defendants of his daily Tylenol prescription for an unrelated condition. It is also undisputed that Plaintiff did not request stronger pain medication or report that his existing medication was ineffective. Under the circumstances,

11

Plaintiff's complaint of ongoing pain is not a genuine issue of material fact that suggests deliberate indifference on the part of defendants. For all of these reasons, Drs. Siddiqui and Ritz shall be granted summary judgment on Count 1.

Wexford's related request for summary judgment on Count 2 shall be granted. A private medical corporation acting under color of state law is treated like a municipal entity. *Whiting*, 839 F.3d at 664. It cannot be liable under Section 1983 based on a theory of *respondeat superior* liability. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Like a municipality, Wexford may only be held liable under Section 1983 for constitutional violations caused by its own policy or custom. Plaintiff may establish a "policy or custom" by pointing to: (a) an express policy that, when enforced, caused a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to amount to a custom or usage that has the force of law; or (c) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). Plaintiff must also establish that the municipality, through deliberate conduct, was the "moving force" because the constitutional injury. *Bd. Of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

Plaintiff was allowed to proceed past screening with a claim that Wexford pushes low-cost alternatives to MRIs. (Docs. 1 and 5; Doc. 62, p. 2, ¶ 6). However, no admissible evidence supports this claim at this stage. Plaintiff merely alludes to a comment made by NP Tindall about an unwritten policy. However, this comment is simply too vague to preclude summary judgment.

In his deposition, Plaintiff also points to a formal written "orthopedic policy and procedure" that governs treatment decisions. (Doc. 62, ¶¶ 30-32; Doc. 62-1, pp. 9, 11). However, he identified no aspect of the policy or procedures that he believed were unconstitutional or that

caused the deprivation of his rights.  Plaintiff clarified that it was defendant's treatment, not the orthopedic policy and procedure, that he challenges in this case.  (Doc. 62, p. 6, ¶ 31; Doc. 62-1, p. 11).  Wexford is entitled to summary judgment on Count 2.

Based on the foregoing discussion, the Court finds that Defendants Siddiqui, Ritz, and Wexford are entitled to summary judgment on the merits.

## DISPOSITION

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 61) is **GRANTED**.  **COUNT 1** is **DISMISSED with prejudice** against Defendants **SIDDIQUI** and **RITZ**, and **COUNT 2** is **DISMISSED with prejudice** against **WEXFORD HEALTH SERVICES, INC**.  All pending motions (Docs. 72 and 74) are **DISMISSED** as **MOOT**.

The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED**.

**DATED: 1/27/2020**                                s/J. Phil Gilbert
                                                                  **J. PHIL GILBERT**
                                                                  **United States District Judge**